## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| THERESA MCFADDEN, *individually and on behalf of all others similarly situated*, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GREYLOCK MCKINNON ASSOCIATES, INC., | |
| Defendant. | |

Plaintiff, Theresa McFadden, individually and on behalf of all similarly situated persons, alleges the following against Defendant, Greylock McKinnon Associates, Inc. ("Greylock" or "Defendant"), based on personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

## I. INTRODUCTION

1. Plaintiff brings this class action against Greylock for its failure to properly secure and safeguard Plaintiff's and other similarly situated consumers' ("Class Members," as defined *infra*) sensitive information, provided to Greylock by its clients, including their names, Social Security Numbers or Individual Taxpayer Identification Numbers, dates of birth, mailing addresses, telephone numbers, Medicare Beneficiary Identifiers or Health Insurance Claim Numbers, Driver's License Numbers and State Identification Numbers, Healthcare Provider and Prescription Information, and Health Insurance Claims and Policy/Subscriber Information ("personally identifiable information" or "PII").

2. Greylock is a consulting firm that provides economic analysis and litigation

1

support for legal, business, and government stakeholders. Greylock received Plaintiff and Class Members' PII in its provision of services to its clients.

3.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Greylock assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

4.      On or about April 8, 2024, Greylock announced that it was the victim of a "sophisticated cyberattack."[1] In a filing with the Office of the Maine Attorney General, Greylock revealed that the PII of 341,650 individuals is believed to have been exposed by the Data Breach.[2]

5.      Greylock failed to adequately protect Plaintiff's and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Greylock's negligent and/or careless acts and omissions and its utter failure to protect its clients' consumers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

6.      Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Greylock's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Greylock's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Greylock's conduct amounts at least to negligence and violates federal and state statutes.

---

[1] *See* Notice of Data Breach, a true and correct copy of which is attached as **Exhibit A**
[2] https://apps.web.maine.gov/online/aeviewer/ME/40/865575ae-973b-4430-a06c-d780da040c74.shtml.

7.      Greylock disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

8.      Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

9.      Plaintiff and Class Members have suffered injury as a result of Greylock's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Greylock's possession and is subject to further unauthorized disclosures so long as Greylock fails to undertake appropriate and adequate measures to protect the PII.

10.      Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Greylock's inadequate data security practices.

## II.  PARTIES

11.      Plaintiff Theresa McFadden is, and at all times mentioned herein was, an

individual citizen and resident of Florida, where she intends to remain.

12.     Greylock is a corporation validly existing and organized under the laws of Massachusetts with its headquarters and principal place of business located at 75 Park Plaza, 4th Floor, Boston, Massachusetts 02116.

## III.  JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is in the hundreds of thousands, many of whom reside outside the state of Massachusetts and have different citizenship from Greylock, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

14.     This Court has general personal jurisdiction over Greylock because it is headquartered in this District.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, Greylock has harmed Class Members residing in this District, and Greylock is subject to the Court's personal jurisdiction with respect to this action.

## IV.  FACTUAL ALLEGATIONS

### A.     *Greylock's Business*

16.     Greylock McKinnon "provides expert economic analysis and litigation support to a diverse group of domestic and international clients in the legal profession, the business community, and government agencies."[3] It boasts over $5 million in annual revenue.[4]

---

[3] About GMA, Greylock McKinnon Associates, https://www.gma-us.com/.
[4] Greylock McKinnon Associates Information, RocketReach, https://rocketreach.co/greylock-mckinnon-associatesprofile_b7e6c2f9c07c2c34.

17.    On information and belief, Greylock accumulates highly private PII of its clients' consumers.

18.    Plaintiff is not affiliated with Greylock. Plaintiff is advised by Greylock's client, the U.S. Department of Justice ("DOJ") that her PII was provided to Greylock in connection with a civil investigation and related litigation matter handled by the DOJ.

19.    The information held by Greylock in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

20.    Upon information and belief, Greylock made promises and representations to its clients, including the DOJ, that the PII collected from them, including that of Plaintiff and Class Members, would be kept safe, confidential, that the privacy of that information would be maintained, and that Greylock would delete any sensitive information after they were no longer required to maintain it.

21.    Plaintiff and Class Members' PII was provided to Greylock by Greylock's clients with the reasonable expectation and on the mutual understanding that Greylock would comply with its obligations to keep such information confidential and secure from unauthorized access.

22.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

23.    Greylock had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Greylock has a legal duty to keep consumer's PII safe and confidential.

24.    Greylock had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), contract, industry standards, and representations made to Plaintiff and

Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

25.     Greylock derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Greylock could not perform the services it provides.

26.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Greylock assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**B.**     ***The Data Breach***

27.     According to the Notice of Data Breach, Greylock discovered the vulnerability on May 30, 2023, but did not notify Plaintiff and Class Members' until April 8, 2024[5].

28.     The Notice of Data Breach provides:

**What Happened?**
On May 30, 2023, we detected unusual activity on our internal network, and we promptly took steps to mitigate the incident. We consulted with third-party cybersecurity specialists to assist with our response to the incident, and we notified law enforcement and the DOJ. We received confirmation of which individuals' information was affected and obtained their contact addresses on February 7, 2024.

**What Information Was Involved?**
Your personal and Medicare information was likely affected in this incident. This information may have included your name, date of birth, address, Medicare Health Insurance Claim Number (which contains a Social Security number associated with a member) and some medical information and/or health insurance information.

**What Are We Doing?**
We consulted with third-party cybersecurity specialists to assist with our response to and remediation of the incident, and we notified law enforcement of the incident. GMA deleted DOJ data from its systems after the incident.[6]

---

[5] *See* Notice of Data Breach.
[6] *Id.*

6

29.     Omitted from the Notice of Data Breach are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

30.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

31.     Greylock did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

32.     The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

33.     Plaintiff further believes her PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**C.     *Greylock Acquires, Collects, and Stores Plaintiff's and Class Members' PII.***

34.     Greylock derives a substantial economic benefit from providing litigation support services for its clients, including the DOJ, and as a part of providing that service, Greylock retains and stores Plaintiff's and Class Members' PII.

35.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Greylock assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

36.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

37.    Greylock's clients, including the DOJ, relied on Greylock to keep Plaintiff and Class Members' PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

38.    Greylock could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members.

39.    Upon information and belief, Greylock made promises to its clients, including the DOJ, to maintain and protect Plaintiff and Class Members' PII, demonstrating an understanding of the importance of securing PII.

40.    Greylock's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D.    *Greylock Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Suspectable to Cyber Attacks.***

41.    Greylock's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the breach.

42.    Data thieves regularly target companies like Greylock's due to the highly sensitive information in their custody. Greylock knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

43.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[7]

44.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Greylock knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

45.     As a custodian of PII, Greylock knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

46.     Despite the prevalence of public announcements of data breach and data security compromises, Greylock failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

47.     At all relevant times, Greylock knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Greylock's data security system were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

48.     Greylock was, or should have been, fully aware of the unique type and the significant volume of data on Greylock's server(s), amounting to potentially hundreds of thousands

---

[7] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (https://notified.idtheftcenter.org/s/), at 6.

of individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

49.     The injuries to Plaintiff and Class Members were directly and proximately caused by Greylock's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

50.     The ramifications of Greylock's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

51.     As corporation in possession of its clients' consumers' PII, Greylock knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Greylock failed to take adequate cybersecurity measures to prevent the Data Breach.

### E.     *Value of Personally Identifiable Information*

52.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[8] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[9]

---

[8] 17 C.F.R. § 248.201 (2013).
[9] *Id.*

53.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[10]

54.    For example, PII can be sold at a price ranging from $40 to $200.[11] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[12]

55.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

56.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[13]

57.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

58.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability

---

[10] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[11] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[12] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[13] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

### F.    *Greylock Failed to Comply with FTC Guidelines.*

59.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

60.    In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

---

[14] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

61.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

62.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63.    As evidenced by the Data Breach, Greylock failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Greylock's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

64.    Greylock was at all times fully aware of its obligation to protect the PII of consumers yet failed to comply with such obligations. Greylock was also aware of the significant repercussions that would result from its failure to do so.

G.    *Greylock Failed to Comply with Industry Standards.*

65.    As noted above, experts studying cybersecurity routinely identify institutions as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

66.    Some industry best practices that should be implemented by institutions dealing

with sensitive PII, like Greylock, include but are not limited to: educating all consumers, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which consumers can access sensitive data. As evidenced by the Data Breach, Greylock failed to follow some or all of these industry best practices.

67.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Greylock failed to follow these cybersecurity best practices.

68.    Greylock failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

69.    Greylock failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**H.    *Greylock Breached Its Duty to Safeguard Plaintiff's and Class Members' PII.***

70.    In addition to its obligations under federal laws, Greylock owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed,

and misused by unauthorized persons. Greylock owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the PII of Class Members.

71.     Greylock breached its obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of their data security practices. Greylock's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.    Failing to adequately protect consumers' PII;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

e.    Failing to adhere to industry standards for cybersecurity as discussed above; and

f.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

72.     Greylock negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted PII.

73.     Had Greylock remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and,

ultimately, the theft of Plaintiff's and Class Members' confidential PII.

### I.       *Common Injuries & Damages*

74.    As a result of Greylock's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Greylock, and which is subject to further breaches, so long as Greylock fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### J.       *The Data Breach Increases Victims' Risk of Identity Theft.*

75.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

76.    The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

77.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the

information to commit a variety of identity theft related crimes discussed below.

78.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

79.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

80.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[15]

81.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

---

[15] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

82.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

83.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

84.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

85.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**K.    *Loss of Time to Mitigate Risk of Identity Theft and Fraud***

86.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

87.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result

of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

88.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[16]

89.     These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

90.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[18]

---

[16] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[17] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.
[18] Jason Steele, "Credit Card and ID Theft Statistics," Oct. 24, 2017, https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.



91.     And for those Class Members who experience actual identity theft and fraud, the GAO Report noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

**L.     *Diminution Value Of PII***

92.     PII is a valuable property right.[20] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

93.     An active and robust legitimate marketplace for PII exists. In 2019, the data

---

[19] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/ new.items/d07737.pdf ("GAO Report").

[20] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

brokering industry was worth roughly $200 billion.[21]

94.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[22,23]

95.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[24]

96.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[25]

97.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

98.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

---

[21] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[22] https://datacoup.com/.
[23] https://digi.me/what-is-digime/.
[24] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.
[25] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

99.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

100.    The fraudulent activity resulting from the Data Breach may not come to light for years.

101.    At all relevant times, Greylock knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

102.    Greylock was, or should have been, fully aware of the unique type and the significant volume of data on its network, amounting to hundreds of thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

103.    The injuries to Plaintiff and Class Members were directly and proximately caused by Greylock's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

**M.    *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.***

104.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

105.    Such fraud may go undetected until debt collection calls commence months, or

even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

106.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

107.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Greylock's failure to safeguard their PII.

**N.    *Plaintiff McFadden's Experience***

108.    Plaintiff is a resident of Miami, Florida.

109.    Plaintiff's PII was obtained by Greylock's client, the DOJ, as part of a civil litigation matter. Greylock received Plaintiff's PII its provision of service to the DOJ in support of that matter.

110.    At the time of the Data Breach, Greylock retained Plaintiff's PII in its system.

111.    Plaintiff and Class Members have been injured by the compromise of their PII.

112.    Plaintiff's PII was compromised in the Data Breach and stolen by cybercriminals who illegally accessed Defendant's network for the specific purpose of targeting the PII.

113.    Plaintiff takes reasonable measures to protect her PII. She has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

114.    Plaintiff stores any documents containing her PII in a safe and secure location and

diligently chooses unique usernames and passwords for her online accounts.

115.    As a result of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach. She monitors accounts and credit scores and has sustained emotional distress. This is time that was lost and unproductive and took away from other activities and work duties.

116.    Plaintiff also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that he entrusted to Defendant for the purpose of obtaining services from Defendant, which was compromised in and as a result of the Data Breach.

117.    Plaintiff suffered lost time, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

118.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, being placed in the hands of criminals.

119.    Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff's PII was compromised and disclosed as a result of the Data Breach.

120.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.  CLASS ACTION ALLEGATIONS

121.    Plaintiff brings this action individually and on behalf of all other persons similarly

situated, pursuant to Federal Rule of Civil Procedure 23.

122.    Specifically, Plaintiff proposes the following class definition, subject to amendment as appropriate:

> All individuals residing in the United States whose PII was compromised in the Data Breach (the "Class").

123.    Excluded from the Class are Greylock and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

124.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

125.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

126.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes that the proposed Class includes about hundreds of thousands of individuals who have been damaged by Greylock's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Greylock's records.

127.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether Greylock engaged in the conduct alleged herein;

    b.    Whether Greylock's conduct violated the FTCA;

    c.    When Greylock learned of the Data Breach;

d.   Whether Greylock failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e.   Whether Greylock's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f.   Whether Greylock's data security systems prior to and during the Data Breach were consistent with industry standards;

g.   Whether Greylock's owed duties to Class Members to safeguard their PII;

h.   Whether Greylock breached their duties to Class Members to safeguard their PII;

i.   Whether hackers obtained Class Members' PII via the Data Breach;

j.   Whether Greylock had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

k.   Whether Greylock breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

l.   Whether Greylock knew or should have known its data security systems and monitoring processes were deficient;

m.   What damages Plaintiff and Class Members suffered as a result of Greylock's misconduct;

n.   Whether Greylock's conduct was negligent;

o.   Whether Greylock breached contracts it had with its clients, including the DOJ, of which Plaintiff and Class Members were third-party beneficiaries;

p.   Whether Greylock were unjustly enriched;

q.   Whether Plaintiff and Class Members are entitled to actual and/or statutory

damages;

r.    Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.    Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

128.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Greylock. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

129.    <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

130.    <u>Predominance</u>. Greylock has engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Greylock's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

131.    <u>Superiority</u>. A class action is superior to other available methods for the fair and

efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Greylock. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

132.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Greylock has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

133.    Finally, all members of the proposed Class are readily ascertainable. Greylock has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent a Notice of Data Breach by Greylock.

**CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**Negligence and Negligence Per Se**
**(On Behalf of Plaintiff and the Class Against Greylock)**

134.    Plaintiff restates and realleges paragraphs 1 through 133 above as if fully set forth herein.

135.    Greylock's clients, including the DOJ, provided the non-public PII of their

consumers, including Plaintiff and Class Members, as a condition of obtaining services.

136.    Greylock had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

137.    By assuming the responsibility to collect and store this data, Greylock had a duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

138.    Greylock had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139.    Greylock owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

140.    Moreover, Greylock had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

141.    Greylock had and continues to have duties to adequately disclose that the PII of Plaintiff and Class Members within Greylock's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

142.    Greylock breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class

Members' PII. The specific negligent acts and omissions committed by Greylock include, but are not limited to, the following:

  a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

  b. Failing to adequately monitor the security of its networks and systems;

  c. Allowing unauthorized access to Class Members' PII;

  d. Failing to detect in a timely manner that Class Members' PII had been compromised;

  e. Failing to remove former consumers' PII it were no longer required to retain pursuant to regulations; and

  f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that it could take appropriate steps to mitigate the potential for identity theft and other damages.

143.    Greylock violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Greylock's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

144.    Plaintiff and Class Members were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

145.    Greylock's violation of Section 5 of the FTCA constitutes negligence per se.

146.    The FTC has pursued enforcement actions against businesses, which, as a result

of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

147.    A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of Greylock's inadequate security practices.

148.    It was foreseeable that Greylock's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

149.    Greylock had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

150.    Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Greylock knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and Class Members, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

151.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

152.    Plaintiff and Class Members had no ability to protect their PII that was in, and possibly remains in, Greylock's possession.

153.    Greylock was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

154.    Greylock's duties extended to protecting Plaintiff and Class Members from the

risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

155.    Greylock has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

156.    But for Greylock's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

157.    There is a close causal connection between Greylock's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Greylock's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

158.    As a direct and proximate result of Greylock's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Greylock's possession and is subject to further unauthorized disclosures so long as Greylock fails to undertake appropriate and adequate

measures to protect the PII.

159.    As a direct and proximate result of Greylock's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

160.    Additionally, as a direct and proximate result of Greylock's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Greylock's possession and is subject to further unauthorized disclosures so long as Greylock fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

161.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

162.    Greylock's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

163.    Plaintiff and Class Members are also entitled to injunctive relief requiring Greylock to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

<u>**COUNT II**</u>
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiff and the Class Against Greylock)**

164.    Plaintiff restates and realleges paragraphs 1 through 133 above as if fully set forth herein.

165.    Greylock entered into contracts with its various clients, including the DOJ, to

provide litigation support services to those clients.

166.    These contracts were virtually identical to each other and were made expressly for the benefit of Plaintiff and Class Members, as it was their PII that Greylock agreed to collect and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and Class Members were the direct and primary objective of the contracting parties.

167.    Greylock knew that if it were to breach the contracts with its clients, the clients' consumers, including Plaintiff and Class Members, would be harmed by, among other things, fraudulent misuse of their PII.

168.    Greylock breached its contracts with its clients, including the DOJ, when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiff's and Class Members' PII.

169.    As reasonably foreseeable result of the breach, Plaintiff and Class Members were harmed by Greylock's failure to use reasonable data security measures to store their PII, including but not limited to, the actual harm through the loss of their PII to cybercriminals.

170.    Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

## COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class Against Greylock)

171.    Plaintiff restates and realleges paragraphs 1 through 133 above as if fully set forth herein.

172.    This count is pleaded in the alternative to the Breach of Third-Party Beneficiary Contract claim above (Count II).

173.    Plaintiff and Class Members conferred a monetary benefit on Greylock, in

providing it, through Greylock's clients, with their valuable PII.

174.    Greylock knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Greylock profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

175.    Greylock failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

176.    Greylock acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

177.    Plaintiff and Class Members have no adequate remedy at law.

178.    Under the circumstances, it would be unjust for Greylock to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

179.    As a direct and proximate result of Greylock's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Greylock's possession and is subject to further unauthorized disclosures so long as Greylock fails to undertake appropriate and adequate measures to protect the PII.

180.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Greylock and/or an order proportionally disgorging all profits, benefits, and other

compensation obtained by Greylock from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

181.    Plaintiff and Class Members may not have an adequate remedy at law against Greylock, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## **PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiff, on behalf of herself and Class Members, requests judgment against Greylock and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Greylock from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Greylock from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Greylock to protect, including through encryption, all data collected through the course of its business in accordance with all

applicable regulations, industry standards, and federal, state or local laws;

iii.   requiring Greylock to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Greylock can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Greylock to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.   prohibiting Greylock from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.   requiring Greylock to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Greylock's systems on a periodic basis, and ordering Greylock to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Greylock to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Greylock to audit, test, and train their security personnel regarding any new or modified procedures; requiring Greylock to segment data by, among other things, creating firewalls and access

37

controls so that if one area of Greylock's network is compromised, hackers cannot gain access to other portions of Greylock's systems;

ix.    requiring Greylock to conduct regular database scanning and securing checks;

x.     requiring Greylock to establish an information security training program that includes at least annual information security training for all consumers, with additional training to be provided as appropriate based upon the consumers' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.    requiring Greylock to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Greylock to implement a system of tests to assess their respective consumers' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing consumers' compliance with Greylock's policies, programs, and systems for protecting personal identifying information;

xiii.  requiring Greylock to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Greylock's information networks for threats, both internal and

external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Greylock to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Greylock to implement logging and monitoring programs sufficient to track traffic to and from Greylock's servers; and

xvi.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Greylock's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 12, 2024.                     Respectfully submitted,

                                           */s/ Christina Xenides*
                                           Christina Xenides, Bar No. 677603
                                           Mason A. Barney*
                                           Tyler Bean*
                                           **SIRI & GLIMSTAD LLP**
                                           1005 Congress Avenue, Suite 925-C36
                                           Austin, TX 78701
                                           Tel: (512) 265-5622
                                           cxenides@sirillp.com
                                           mbarney@sirillp.com
                                           tbean@sirillp.com

                                           *Counsel for Plaintiff and the Putative Class*

                                           **Pro hac vice* forthcoming*